UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Case No. 20-62WES |
| BERNARD KLEIN, | |
| Defendant. | |

GOVERNMENT'S OBJECTION TO THE FINAL PRESENTENCE REPORT, RESPONSE
TO DEFENDANT'S OBJECTIONS, AND SENTENCING MEMORANDUM

Over the course of many years, the defendant directed the manufacture and

subsequent importation into the United States of millions of dollars of counterfeit

uniforms and gear for the benefit of his co-conspirator, Ramin Kohanbash. The

defendant worked with his Chinese counterparts, "Adam," "Judy," and others, to

handle every phase of the counterfeit product manufacture, from development through

production and delivery to Kohanbash. The defendant, his Chinese counterparts, and

Kohanbash strategized and discussed how to subvert Chinese and American customs.

They worked together to make sure that the counterfeit military uniforms and gear

made it safely to Kohanbash's New Jersey warehouse. From there, Kohanbash and

other members of the conspiracy sold the counterfeit goods to the United States military

and its suppliers, and ultimately those counterfeit goods were worn or carried by

American soldiers and airmen.

The defendant and his co-conspirators engaged in these criminal acts solely to

make money. For them, it was just business. But it was much more than that to their

victims. A number of businesses who manufacture clothing and gear for the military

had their trademarks counterfeited by the defendant and his co-conspirators.  These businesses, at least one of which is a small, Rhode Island business, United Associates Limited ("United"), suffered damage to their reputation and brand, and loss of sales.

The trademark holders, however, were not the only victims of the defendant's scheme.  The ultimate consumer, the United States military, acquired uniforms and gear that were not what they purported to be.  In some instances, this meant that soldiers and airmen received items which were of substandard quality, but more importantly, some of these counterfeit items lacked the safety features found in genuine articles, such as flame resistance or nIR technology (providing resistance to detection by night vision goggles).

This case demonstrates the dangers associated with counterfeiting and corruption of the military supply chain.  The facts of this case, and the significant part played by the defendant, highlight the need for a sentence which will reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence.  The United States recommends a sentence of imprisonment at the low-end of the guideline sentencing range, a term of supervised release of three years; no fine in light of the restitution obligation of the defendant's; restitution as provided in paragraphs 95-99 of the Pre-Sentence Investigation Report ("PSR"); and, the mandatory special assessments of $100.

A.   **GUIDELINE CALCULATIONS**

1.  **The defendant's guidelines range is improperly calculated because in the final PSR he did not receive a two-level upward adjustment for a substantial part of his scheme having been committed from outside of the United States.**

An enhancement under U.S.S.G. § 2B1.1(b)(10)(B) is appropriate where an essential part of the scheme was committed overseas. See United States v. Ogunbanke, 619 Fed.Appx. 586, 587-88 (9th Cir. 2015) (unpublished) (applying enhancement to a defendant who forwarded stolen credit card numbers to co-conspirators overseas to make fraudulent credit cards which they used overseas). "The scheme does not need to originate from outside the United States, and the defendant does not need to take action outside the United States for the enhancement to apply." United States v. Williams, --- Fed. Appx. ---, 2020 WL 7828739, at *1 (11th Cir. Dec. 31, 2020) (unpublished) (applying enhancement to a defendant whose co-conspirator was operating out of Jamaica).

When determining the applicability of the enhancement, the court looks at the overall scheme, not just the acts of the individual participants. Id.; see United States v. Singh, 290 F.3d 756, 761 (11th Cir. 2002). Regardless of the defendant's location, if a substantial part of the scheme occurred overseas and the overseas nexus was reasonably foreseeable to the defendant, then the enhancement applies. See, e.g., United States v. Cox, 462 Fed. Appx. 646, 646-47 (8th Cir. 2012) (unpublished) (applying the enhancement to a defendant who received packages and money transfers from overseas, sent proceeds of cashed counterfeit instruments to recipients overseas, and engaged in international communications with coconspirators). The enhancement applies when the overseas nexus is foreseeable to the defendant, because reasonably

foreseeable acts of a defendant's co-conspirators may be attributed to the defendant. Williams, 2020 WL 7828739, at *1; see United States v. Chukwu, --- Fed. Appx. ---, 2021 WL 21717, at *7 (11th Cir. Jan. 4, 2021) (unpublished) (applying the enhancement to a domestically based defendant, because the defendant wired money to Nigeria and an IP address associated with the scheme was associated with Malaysia); United States v. Fauchner, 464 Fed. Appx. 674, 676 (9th Cir. 2012) (unpublished) (applying the enhancement where the defendant admitted that he knew the proceeds of the "phishing" scheme were coming from outside of the United States).

In this case, it is beyond dispute that a substantial part of the scheme occurred overseas, primarily in China.  Nonetheless, in the Addendum to the PSR, the Probation Department, at the defendant's urging, reversed its position on the applicability of this guidelines provision.  In removing this adjustment, the Probation Department improperly focused upon the location of the defendant during the conspiracy as opposed to the location of an essential part of the scheme, namely the manufacture of the counterfeit goods themselves and the subsequent smuggling of those goods into the United States.  The government disagrees with the Probation Department's analysis not only because it incorrectly focused upon the location of the defendant, but also because its position was premised on a misunderstanding of the facts.

As set forth in the case law cited above, the focus should be on whether essential acts in furtherance of the conspiracy were committed overseas.  Here, again, the overseas nexus is obvious -- the counterfeit goods were manufactured overseas where they were then packaged (overseas) for smuggling into the United States.  And, the

4

evidence uncovered during the investigation demonstrated that not only was the defendant personally responsible for many of the overseas acts in furtherance of the counterfeiting, the actions of his co-conspirators and associates were reasonably foreseeable to him.

The defendant described his business, Rivoran Trading (later Almont), on its website as a "Chinese based manufacturing and sourcing company with liaison offices in the United States." See Dkt. # 39-2, p.36.  The website also declared that the defendant's business was "more than a simple jobber for matching factories and customers.  We contract with our own offices and factories as well as qualified affiliates . . . .  We handle every phase of product manufacture from development through production and delivery to the destination port."  The defendant's business address, 1575 50th Street, Brooklyn, NY, and phone number were listed at the bottom of the website pages quoted.

Aside from his business's self-proclaimed description as a "Chinese based" company, the investigation proved that a substantial part of the charged scheme occurred outside of the United States.  Significantly, the counterfeit goods themselves were manufactured in factories in China and Pakistan at the request and direction of the defendant for the benefit of his customer, Kohanbash.  Additionally, the defendant regularly traveled to China for work (over 20 times during the charged conspiracy); he corresponded with Chinese employees of Rivoran Trading, such as "Judy" and "Adam," to place orders for counterfeit goods, and to make any changes to those goods prior to mass production; he regularly wired funds to China as payment for the

counterfeit goods; the defendant obtained legal representation in China to preserve his and Kohanbash's interests when a dispute arose with a Chinese factory about Multicam parkas; the defendant assisted with the shipment of counterfeit goods to the United States from "Alex," a mutual associate of his and Kohanbash's; and the defendant and Kohanbash worked with their Chinese counterparts to mislead Chinese and American customs.

In short, to say that a substantial or essential part of this scheme did not occur outside of the United States, is to ignore half of the criminal conspiracy.

### 2. The defendant properly received an adjustment for an offense involving ten or more victims under U.S.S.G. § 2B1.1(b)(2)(A).

The defendant pled guilty to conspiring to participate in a scheme to defraud and obtain money and property through materially false representations involving the use of the mails or other interstate carrier. As part of the scheme, the defendant and his co-conspirators, including Kohanbash, manufactured counterfeit goods for resale. These counterfeit goods bore spurious marks and tags or labels which falsely represented the manufacturer and country of origin of the goods. The defendant now disputes that the trademark holders, whose marks were counterfeited as part of the scheme, were victims. He also contends that the customers of these counterfeited goods, who were duped into purchasing goods which were represented to be something that they were not, are not victims despite having paid for goods which they did not receive. The defendant also argues that because he did not know the identity of the "downstream" customers, they are not victims.

6

A victim is any person or business "who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1, App. Note 1. "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." Id. at App. Note 3. When it comes to counterfeiting trademarks, victims include not only trademark holders, but also purchasers of those counterfeit goods. United States v. Song, 934 F.2d 105, 109 (7th Cir. 1991) ("The counterfeit trafficking statute was designed to protect individual victims—purchasers, manufacturers, and retailers. . . ."). In counterfeiting cases, actual loss to the victim is often measured in terms of lost sales. See United States v. Milstein, 481 F.3d 132, 137 (2d Cir. 2007) (assessing restitution based on lost sales).

To identify the victims in this case, and the loss they suffered, the government identified counterfeit goods manufactured by the defendant, the trademark holder whose mark was counterfeited, the number of counterfeit units sold by the defendant, and the price charged. The victims identified in ¶ 20 of the PSR are the trademark holders who lost sales through the defendant's scheme and include 12 companies as well as the U.S. Army and the U.S. Marine Corps. A number of those companies, in particular the small businesses, submitted specific claims for restitution based on the units sold and their lost sales revenue.

Additionally, the U.S. Air Force, who was the primary customer of the counterfeit or otherwise mislabeled goods, is a victim. The Air Force suffered loss because it paid for goods which were falsely represented to be genuine or to have other material characteristics such as being flame resistant, made in the USA, to have been

7

manufactured pursuant to military contract numbers, or to have been manufactured by certain defense manufacturers.  In short, the Air Force suffered loss because it did not receive the goods it had purchased; instead the Air Force received cheap, "knock-offs" that were made in China and falsely labeled.

### 3.  The defendant did not have a minor role.

The defendant played an essential and important role in the charged fraud scheme, and he was closely involved with Kohanbash in the criminal activity.  He should not receive a downward adjustment for minor role.

A "minor participant" is less culpable than most other participants in the criminal activity.  See U.S.S.G. § 3B1.3, App. n. 5.  The guidelines provide that in assessing whether a defendant deserves a mitigating role adjustment, the Court should consider the "totality of the circumstances" and consider the degree to which the defendant understood the full scope of the conspiracy, the degree to which he participated in planning the criminal activity, the nature and extent of the defendant's participation, and the degree to which the defendant benefited.  See id. at App. n. 3.

The defendant's role in the conspiracy focused upon the manufacturing of counterfeit goods, which he supplied to Kohanbash, a wholesaler of military uniforms and gear.  The defendant was Kohanbash's primary supplier of counterfeit and falsely labeled goods, and he knew the quantity Kohanbash purchased.  While the defendant may not have had direct knowledge of the precise way in which Kohanbash sold the counterfeit items (largely through North Dakota company D.O. and co-conspirator Terry Roe), he certainly knew that Kohanbash, who ordered thousands of units of

counterfeit and falsely labeled military uniforms and gear at a time, distributed those goods to others.  In fact, Kohanbash specifically referenced customers in his email communications with the defendant.

The defendant's role in planning and decision-making is easily demonstrated by a note in the report of HSI Special Agent Willshaw attached as Exhibit 4 to the government's response to the defendant's objections to the PSR.  In that report, Agent Willshaw stated:

> On November 4, 2018, KLEIN had a message conversation with a contact regarding "CAL". (Agent's Note: On October 10 and 11, 2018 law enforcement executed a federal search warrant on KOHANBASH's CALIFORNIA SURPLUS warehouse located in New Jersey). KLEIN stated he would see the contact in HK (Agent's Note: the common abbreviation for Hong Kong). The contact stated repeatedly that he was available to speak with KLEIN over the phone and KLEIN stated that he could not and "**As I said, all orders should be placed on hold (including fabric from mills) and I will advise reason and details when I meet you" and "I don't know if will solve soon, I will talk to you when I see you**." On November 13, 2018, KLEIN departed the US for Hong Kong. On November 20, 2018, KLEIN returned to the US from Hong Kong. (emphasis added)

The defendant and Kohanbash were in almost daily contact, by email, Whatsapp and telephone.  When there were problems, Kohanbash contacted the defendant.  For example:

- In 2016, when U.S. Customs notified Kohanbash that they had seized counterfeit Northface® jackets, Kohanbash forwarded the notice to the defendant.
- On another occasion in 2016, when Kohanbash told the defendant he was having problems with Customs, the defendant agreed to have a shipment redirected to his office or Kohanbash's residence.
- In 2017, when general counsel for Crye, a trademark holder, wrote to Kohanbash regarding Kohanbash's sale of counterfeit Multicam®, Kohanbash forwarded the notice to the defendant.

- On July 23, 2018, Kohanbash forwarded to the defendant a U.S. Customs' detention notice regarding counterfeit merchandise, to which the defendant replied, "Oh my god".
- When the agents executed a search warrant at Kohanbash's warehouse on October 10 and 11, 2018, Kohanbash immediately contacted the defendant and provided him with a copy of the warrant.

Similarly, when Kohanbash received questions from his customers, he contacted the defendant.  For example, in 2017, when an employee at D.O. emailed Kohanbash with questions regarding Berry Amendment compliance and TAA compliance regarding goods to be sold on GSA, Kohanbash forwarded the email to the defendant. In 2016, when the same employee had questions regarding GSA compliance, Kohanbash forwarded to the defendant a spreadsheet labeled: "GSARetailPriceListwithCOO[1]BerryTAAMay2016CASURPLUS.xlsx."

The close daily contact between Kohanbash and the defendant demonstrate more of a criminal partnership than a superior-subordinate relationship.  The defendant was fully aware of the scope of Kohanbash's counterfeiting business; Kohanbash alerted the defendant when he had problems or questions; and, the defendant worked with Kohanbash to repeatedly manufacture and import counterfeit goods into the United States over five years.  His role was by no means the isolated, limited role of a minor participant.  The defendant's request for a mitigating role adjustment should be denied.

**B.**   **18 U.S.C. § 3553 SENTENCING FACTORS**

The seriousness of the offense, the need to protect the public, and the need for

---

[1] COO is believed to be a reference to "country of origin" which is important for compliance with the Berry Amendment and Trade Agreements Act ("TAA") compliance.

adequate deterrence all point to a lengthy sentence of incarceration in this case. However, the defendant's lack of criminal history and his post-plea behavior argue in favor of a sentence at the low-end of the range. Pursuant to the plea agreement, and in consideration of the defendant's lack of criminal history and behavior post-plea, the government recommends a sentence at the low-end of the guideline range.

### 1. The nature and circumstances of the offense warrant a significant sentence of imprisonment.

The investigation in this case revealed a far-reaching conspiracy with tentacles in China, Pakistan, New Jersey, New York, and North Dakota. The criminal conduct lasted for years and involved millions of dollars of counterfeit goods. The defendant's involvement in the conspiracy was substantial; he was Kohanbash's primary source of supply and his email communications with Kohanbash and the Chinese-based employees of Rivoran Trading demonstrate that the defendant was involved in every aspect of the manufacture of the counterfeit goods.

A good example of how involved the defendant was in the counterfeiting is reflected in Purchase Order 471, Kohanbash's order of 1,000 counterfeit United Multicam APEC jackets. See Exhibit 1 – Purchase Order 471. In the defendant's and Kohanbash's communications regarding this order, the defendant forwarded to Kohanbash questions from China regarding the appearance and labels for the jacket. See Exhibit 2 – Email and Whatsapp. On page 2 of the Exhibit, Kohanbash responded to the questions in red. As part of his instructions, Kohanbash asked that an "NSN#" be placed on the label and under the neck. An NSN or National Stock Number is a

numeric code that identifies the standardized material items of supply as they have been recognized by all NATO countries including United States Department of Defense. On page 3 of the Exhibit, the defendant sent via Whatsapp a picture of the United hangtag and asked Kohanbash if this was the hangtag for Purchase Order 471, to which Kohanbash responded, "Yes." Detailed communications between the defendant and Kohanbash like those in Exhibit 2 are common and illustrative of the defendant's level of involvement.

Kohanbash paid the defendant directly for most orders of the counterfeit goods, although sometimes he wired funds directly to China. Analysis of Kohanbash's QuickBooks and bank accounts revealed that between January 2013 and October 2018, Kohanbash purchased approximately $11 million in goods from the defendant, and he paid more than $10.9 million directly to the defendant during that time. Based upon the government's analysis of the defendant's primary Almont bank accounts, between November 2014[2] and October 2018, it appears that the defendant received $11.1 million into those accounts, of which $8.1 million were payments from Kohanbash. During that same time period, the defendant paid $6.49 million to entities in China or Pakistan, $2.29 million of which was paid to Rivoran Trading, Inc. Ningbo.

The defendant contends that Kohanbash was just one of many of his customers, but a search of the defendant's Almont QuickBooks from October 2014 through October 2018 reveals that Kohanbash was the defendant's largest customer during that time

---

[2] The government did not have Almont bank account information for the defendant available from before October 2014. His earlier accounts appear to have been held in the name of Rivoran Trading and have not been closely analyzed.

frame.  See Exhibit 3 – Almont Group, Inc. Sales by Customer Summary.[3]  Significantly, the defendant was Kohanbash's primary supplier, accounting for $11 million of the $14 million in goods acquired by Kohanbash during the charged conspiracy.  See Exhibit 4 – California Surplus Purchases by Vendor Summary.  These figures demonstrate that these two co-conspirators were heavily dependent on one another and did substantial business together, explaining their nearly daily contact with each other.

Their close relationship is further evidenced by Kohanbash's prompt contact to the defendant after the agents executed the search warrant at Kohanbash's warehouse on October 10 and 11, 2018.  Kohanbash forwarded a copy of the search warrant and the target letter to the defendant.  Then, approximately one month after agents executed the warrant, the defendant traveled to China.  On his return trip to the United States he was searched at the border.  From that search, as discussed above on page 9, agents recovered evidence that the defendant met with his Chinese co-conspirators during that trip.[4]  This border search and the email communications discovered during the search warrants are what led to the lengthy negotiations between the defendant and the government regarding this case.  Nearly two years later, the defendant entered a plea of guilty and accepted responsibility for his role in what has been shown to be a dangerous criminal venture.

The danger posed by this counterfeiting ring to the ultimate customer, American

---

[3] The government did not have access to Almont Group QuickBooks from before October 2014.

[4] For example, on November 4, 2018, while messaging with a Chinese associate about Kohanbash's problems, the defendant refused to discuss the matter on the phone, but he told his Chinese counterpart that he would advise him of what happened when he saw him in person.

military personnel, should not be discounted.  Even if the defendant did not deal directly with the military or have knowledge of the safety features that were lacking, such as the nIR technology providing the wearer with resistance to night vision goggles and flame resistance, the end result of his counterfeiting was equipping military personnel with substandard and in some cases unsafe equipment.

Moreover, the defendant's long-lasting criminal activity resulted in harm to at least 12 businesses.  The victim letters vary in length and detail, but they all demonstrate how zealously the victims seek to protect their trademarks and the impact the defendant's blatant and egregious counterfeiting of their marks had on their business.

Another characteristic of the defendant's offense which bears consideration by the Court is the effort devoted by the defendant, his Chinese counterparts and Kohanbash to avoiding detection by authorities.  See Exhibit 5 – WhatsApp communications regarding the counterfeit Army PT Jacket.  The email and text communications obtained as part of the investigation demonstrate that the conspirators folded garments to conceal their trademarks and hide their hangtags.  They also packaged and labeled the goods to hide their contents.  And, they placed easily removable tags and stickers on the garments and the boxes such that the goods could make it through customs, but then any reference to China could be easily removed from the goods or their packaging material.  All of these steps were taken with an eye towards subverting customs and ensuring that counterfeit goods from overseas would successfully enter the supply chain.

The defendant's actions are those of a smart and sophisticated businessman, comfortable conducting his business at home and abroad.  Because so much of the activity occurred overseas, the government was unable to gain a full picture of the defendant's finances and assets; however, it is clear that his personal accounts in the United States saw deposits in excess of $200,000 all years during the conspiracy except 2017 and in addition, personal expenses, such as donations to a Synagogue and $89,000 in payments to a high-end clothing shop, are paid from his business accounts.  The defendant has $2 million in equity in his home, he drives a BMW and an Acura, and he even managed to acquire a Paycheck Protection Program loan before the charge was filed in this case.  During the years in which he served as Kohanbash's primary supplier of counterfeit military goods, the defendant lived a comfortable life, and he continues to do so, most recently taking a vacation to Puerto Rico while awaiting sentencing.

## 2.   A sentence of imprisonment at the low-end of the guideline range is necessary to achieve the goals of 18 U.S.C. § 3553.

The sentence in this case must promote respect for the law and provide just punishment.  It must also deter the defendant and others from participating in schemes such as this.

The defendant's crime did not occur in a vacuum.  His greed resulted in harm to numerous businesses and the United States military.  See Exhibit 6 – Agent Mousseau's Summary of Counterfeit Items.[5]  A number of victims submitted impact statements in

---

[5] Agent Mousseau's analysis was conservative, including only those items that she could definitively identify as counterfeit or falsely labeled based upon the controlled purchases, information acquired during border searches, observations during the search warrant executed at Kohanbash's warehouse, familiarity with email communications between the co-conspirators, and interviews with the trademark

anticipation of the sentencing of this defendant, but one of the most poignant is the statement of Mr. Val Boezi, the owner of United.  United is a family owned and operated business manufacturing protective clothing for the military since 2000.  Mr. Boezi works with his adult children in the business headquartered in North Kingstown, RI.  In his statement, Mr. Boezi described the impact of the defendant's counterfeiting on his business, but also on his pride.  This counterfeiting ring damaged Mr. Boezi personally, causing him great shame and affecting his relationship with long-standing military clients.  Mr. Boezi's letter illustrates that what was just business to the defendant, hurt real people struggling to operate a local, small business within the rules.

Similarly, the letter from Massif, another military clothing manufacturer, illustrates the importance of reputation to the small businesses victimized in this case. Massif, another American owned business, employs approximately 40 people, and over the years has grown from a business supplying search and rescue teams to serving every branch of the U.S. Armed Forces.  According to the letter submitted by their general counsel, the company asks that the Court recognize and appreciate the damage done to their hard-earned reputation for quality products.

It is important that military servicemembers, private citizens and businesses

---

holders and Kohanbash.  Additionally, because the defendant's QuickBooks did not include sales from 2013, the first year of the charged conspiracy, the 2013 counterfeit sales or sales of falsely labeled goods were not included in Agent Mousseau's total.  However, because Agent Mousseau has also reviewed Kohanbash's QuickBooks, she knows that Kohanbash purchased approximately $2,000,000 in goods from the defendant during 2013.  If she were to analyze sales from 2013 based upon the data from Kohanbash's QuickBooks, it is likely that she would identify additional sales of counterfeit or falsely labeled goods.

know that they will receive justice from the court system, and that criminals cannot harm them with impunity.  The sentence recommended by the government is based on the scope of the criminal activity and the need to provide justice to the victims for the harm inflicted by the defendant.

The government's recommended sentence also considers the need to specifically deter the defendant and the need to persuade others to not engage in similar misconduct.  The defendant committed his offense over the course of years.  He was neither unsophisticated, nor uninformed at the time he committed this offense.  He had been operating Rivoran Trading (Almont), a multi-national corporation, for seven years at the time the charged conspiracy began.  He was a world traveler, taking frequent trips to destinations such as China, Israel, Japan, Thailand, Canada, Aruba, Mexico, the Dominican Republic, Panama and Spain, and he has lived overseas in the U.K. and Israel.  His crime was not an isolated event, nor was it a crime of passion or a crime induced by anything other than a desire to make money.  The defendant's actions were deliberate and executed in a manner designed to evade law enforcement.  The sentence sought by the United States will deter the defendant from further fraud for at least the period of incarceration and hopefully for good.

Moreover, the sentence will be heard by other individuals who may be deterred if the consequences of breaking the law outweigh the considerable financial gain to be had from criminal activity.  It is obvious from the events that have occurred since the defendant's change of plea, that theft of intellectual property is a rampant problem.  The problem is magnified when the counterfeiting results in substandard quality goods or

worse yet, dangerous counterfeit goods.  The Court can see from the obvious outrage included in some of the victim statements, that those in the business of supplying the military with uniforms and gear take their obligation to provide a safe and true product to our servicemembers seriously.  These victims seek a sentence that will deter others from corrupting the military supply chain.  For all of these reasons, the Court's sentence must make general as well as specific deterrence a priority.

### 3. A sentence at the low-end of the guideline range will avoid unwarranted sentencing disparities.

The defendant compares his case to counterfeiting cases involving counterfeit consumer goods like purses and sneakers.  He suggests that such cases typically result in sentences of probation.  While the government rejects the defendant's comparison on the facts, the government can easily cite to cases involving counterfeit consumer goods that result in sentences of imprisonment.  See, e.g., United States v. Neuman, 406 Fed. Appx. 847 (5th Cir. 2010) (unpublished) (defendant sentenced after trial to 210 months imprisonment for trafficking in $632,075 in counterfeit Nike items); United States v. Yu, 2:10-CR-00171-PA (CDCA) (counterfeiter of $581,000 in exercise equipment sentenced to 41 months in prison for counterfeiting and attempting to bribe customs official); United States v. Robinson, 4:10-CR-00370-CEJ (EDMO) (trafficker in counterfeit clothing and shoes sentenced to 33 months imprisonment); United States v. Cabrera, 2:09-CR-00173HDM-PAL (D. Nev.) (two individuals sentenced to 24 months imprisonment for counterfeiting slot machines and computer programs and ordered to pay $151,800 in restitution); United States v. Freyling, 1:08-CR-00384-LJO (EDCA) (two defendants

sentenced to 121 months and 95 months for operation of major Internet-based DVD importation and distribution business as well as Freyling's fraudulent receipt of government benefits).

The defendant's criminal activity goes beyond the counterfeiting of DVDs or sneakers because his actions ultimately resulted in military servicemembers wearing counterfeit goods. While the government agreed to recommend that the Court not impose certain adjustments under U.S.S.G. §§ 2B5.2(b)(6) and (b)(7) for an offense involving a reckless risk of serious bodily injury or an offense involving counterfeit military goods the use of which is likely to result in significant harm, the government did not intend to suggest to the Court that the case is on par with vendors of counterfeit purses.

While it is true that there is no direct evidence that the defendant knew that the counterfeit items were sold to the U.S. military, it is equally true that he routinely filled large orders of items that were obviously military in nature. Moreover, there is no question that these items were ultimately worn by American servicemen. Likewise, while there is no evidence that the defendant had actual knowledge that the items lacked required safety features, it is undisputed that they did. His callousness endangered servicemembers whether he knew or intended such a result.

This case demonstrates the danger posed to American military personnel by corruption of the military supply chain. To ask that reference to the military be removed from the PSR, or that the Court disregard who ultimately wore these counterfeit FREE® hoods, Multicam® jackets, Combat Shirts, Level III Grid Fleece

19

Jackets, GI Flight Gloves, or Gen III Level 7 in Foliage, is to ask that the Court put on blinders.

C.   **CONCLUSION**

Counterfeiting of the kind that occurred in this case is difficult to detect and challenging to investigate, especially when involving an affluent and skilled counterfeiter like the defendant.  The Department of Defense, and its investigative partners, devoted considerable resources to identifying the targets, gathering the evidence, and pursuing a just result against the perpetrators and their businesses.  The investigative commitment by the various agencies impacted reflects the seriousness of the offense and the importance placed on holding the defendant, Kohanbash, Terry Roe and their affiliated businesses accountable.  The punishment in this case must reflect the seriousness of the offense and provide a just punishment as well as deterrence.  The

sentence sought by the government will not only protect intellectual property, but will

protect our servicemembers and restore confidence in the military supply chain.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorney,

RICHARD B. MYRUS
Acting United States Attorney

/s/ Sandra R. Hebert
SANDRA R. HEBERT
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
Email:  sandra.hebert@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 6th day of April 2021, I filed the above Sentencing Memorandum using the Court's electronic filing system.

/s/ Sandra R. Hebert
SANDRA R. HEBERT
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
Email:  sandra.hebert@usdoj.gov